## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **Marna Berkman, individually and on behalf of all others similarly situated,** )<br>)<br>) | **CASE NO.:** _____ |
| ) | |
| **Plaintiff,** ) | **CLASS ACTION COMPLAINT** |
| ) | |
| **v.** ) | |
| ) | |
| **MCNEIL-PPC, INC.,** ) | **JURY TRIAL DEMANDED** |
| ) | |
| **Defendant.** ) | |

Plaintiff, Marna Berkman, individually and on behalf of all others similarly situated, by her undersigned attorneys, for her Complaint against defendant McNeil-PPC, Inc. ("McNeil" or "Defendant") upon knowledge as to matters relating to herself and upon information and belief as to all other matters, alleges as follows:

### NATURE OF THE ACTION

1.     This class action is brought on behalf of all persons or entities who purchased Imodium Advanced® ("Imodium Advanced") in the United States during the period from October 1, 2000 to the present (the "Class Period") to recover damages caused by Defendant's violations of Section 2 of the Sherman Act, 15 U.S.C. §2, and the antitrust and/or unfair business competition statutes of twenty states and the District of Columbia.  Defendant's unlawful conduct prevented generic versions of Imodium Advanced from coming to the United States market, thereby causing injury to plaintiff and other members of the class.

2.     Imodium Advanced is an over-the-counter anti-diarrheal/anti-flatulent drug. Defendant McNeil has been marketing Imodium Advanced since the drug first received FDA approval in 1997 and has recognized well over a $100 million in sales from this drug.  No generic version of Imodium Advanced is currently marketed in the United States because Defendant, through "repeated erroneous representations, failure to disclose relevant prior art, and overall persistence in prosecuting exceedingly obvious inventions" deceived the Patent and Trademark Office ("PTO") into issuing a series of patents covering an anti-diarrheal/anti-flatulent drug.  These patents include: U.S. Patent No. 5,248, 505 (the "`505 patent"); U.S. Patent No. 5,612, 054 (the "`054 patent"); U.S. Patent No. 5,679,376 (the "`376 patent"); and U.S. Patent No. 5,716,641 (the "`641 patent").

3.     Upon closer examination by this Court, Defendant's actions before the PTO have been criticized as "a scheme without the slightest regard for the intent and purposes of the patent laws.  Indeed, [Defendant's] sole motive was to compromise these statutes and constitutional protections for the sake of profits."  On or about June 25, 2002, Defendant's patents for the anti-diarrheal/anti-flatulent agent were ruled invalid for obviousness.

4.     L. Perrigo Company ("Perrigo"), a generic manufacturer of pharmaceuticals, has filed an  application with the FDA requesting approval to market a generic version of Imodium Advanced.  In its application, Perrigo asserted that its product is bioequivalent to Imodium Advanced and does not infringe any valid patent owned by or licensed to Defendant.  Because of Defendant's actions, however, no generic formulation of Imodium Advanced has been approved by the FDA.

5.    Count I of this Complaint is brought by Plaintiff, on behalf of herself and all others similarly situated ("Nationwide End-Payor Class"), seeking injunctive and declaratory relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

6.    Count II of this Complaint is brought by Plaintiff, on behalf of herself and a proposed sub-class of indirect purchasers who purchased or paid for Imodium Advanced in Arizona, California, District of Columbia, Florida, Kansas, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin (collectively, the "Indirect Purchaser States"), alleging agreements in restraint of trade and monopolization of the market for Imodium Advanced in violation of the antitrust laws of the Indirect Purchaser States (the "Indirect Purchaser Sub-Class").

7.    Count III of this Complaint is brought by Plaintiff on her own behalf and on behalf of the Nationwide End-Payor Class, seeking a constructive trust and disgorgement of the unjust enrichment of defendants.

## JURISDICTION AND VENUE

8.    This action is brought under Section 16 of the Clayton Act, 15 U.S.C. §26, for injunctive relief, and the costs of suit, including reasonable attorneys' fees, for injuries to plaintiff and members of the class resulting from, *inter alia*, defendants' violations of the federal antitrust laws.  The Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1337 and 15 U.S.C. §26.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367(a).

3

9.    Venue is proper in this judicial district pursuant to 15 U.S.C. §22 and 28 U.S.C. §1391(b) because a substantial portion of the affected trade and commerce described below has been carried out in this district.

## INTERSTATE TRADE AND COMMERCE

10.    During all or part of the relevant time period:

1.    Defendant manufactured and sold substantial amounts of Imodium Advanced in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States;

2.    Defendant transmitted funds as well as contracts, bills and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of Imodium Advanced; and

3.    Defendant employed, in furtherance of their monopolization and attempt to monopolize, as alleged herein, the United States mails and interstate and international telephone lines as well as means of interstate and international travel.

11.    The illegal monopolization and attempt to monopolize the market for Imodium Advanced and its generic bioequivalents alleged herein have substantially affected interstate commerce.

## THE PARTIES

### Plaintiff

12.    Plaintiff Marna Berkman is a citizen of the State of New York.  Plaintiff Marna Berkman purchased Imodium Advanced during the Class Period and, like the other members of the class, paid more than she would have absent Defendant's unlawful monopolization and attempts to restrict generic competition for Imodium Advanced.

4

**Defendant**

13.    McNeil-PPC, Inc. is a New Jersey Corporation with its principal place of business in Fort Washington, Pennsylvania.  McNeil markets a range of over-the-counter and prescription drugs.  McNeil is a division of the leading pharmaceutical giant Johnson & Johnson.

## RELEVANT MARKET

14.    To the extent applicable to the claims alleged herein, the relevant product market is the market for the manufacture and sale of Imodium Advanced and generic bioequivalents. The relevant geographic market is the United States as a whole (for Counts I and III) and the Indirect Purchaser States (for Count II).  At all relevant times, including the present. Defendant's market share in the relevant product and geographic markets was and is 100%.

## FACTUAL ALLEGATIONS

### A.    The Federal Scheme for Approval of Pioneer Drugs

15.    Under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* (the "Act") approval by the FDA is required before a company may begin selling a new drug. Premarket approval for a new drug, often referred to as a "pioneer" or "branded" drug, must be sought by filing a New Drug Application ("NDA") with the FDA demonstrating that the drug is safe and effective for its intended use.  New drugs that are approved for sale in the United States by the FDA are typically (but not necessarily) covered by patents, which provide the patent owner with the exclusive right to sell that new or pioneer drug in the United States for the duration of the patents involved, plus any extension of the original patent period (the "FDA Exclusivity Period") granted pursuant to the Drug Price Competition and Patent Term restoration

Act of 1984, 98 Stat. 1585, codified at 21 U.S.C. §355(j) (the "Hatch-Waxman Act") and 35 U.S.C. §271(e).

16.    In addition to information on safety and efficacy, NDA applicants must submit to the FDA a list of all patents that claim the drug for which FDA approval is being sought, or that claim a method of using that drug, and with respect to which a claim of patent infringement could reasonably be asserted against an unlicensed manufacturer or seller of the drug.

17.    Once the NDA is approved, the FDA lists any patents referenced as part of the NDA application process in the *Approved Drug Products with Therapeutic Equivalence Evaluations* (commonly referred to as the "Orange Book"), where it can be easily found and consulted by future FDA applicants.

18.    Pursuant to 21 U.S.C. §355(c)(2), if, after its NDA is approved, the pioneer drug manufacturer obtains a new patent that claims the drug or methods of its use, the company must supplement its NDA by submitting information on the new patent within 30 days of issuance. The FDA then lists the new patent in a supplement to the Orange Book.  The FDA is required to accept as true the patent information is obtains from patent holders, and to withhold its approval of a subsequent drug application, whenever the patent holder presents a litigated dispute (baseless or not) regarding the validity or infringement of the patent.  If an unscrupulous patent holder provides false information to the FDA or files frivolous patent infringement actions to delay the onset of generic competition, the FDA is powerless to stop it.

19.    Once the safety and effectiveness of a new drug is approved by the FDA, it may be used in the United States.

**B.    Generic Drugs**

20.    Generic drugs are drugs that the FDA has found to be bioequivalent to brand name drugs, *i.e,* generic drugs have the same active chemical composition and provide the same therapeutic effects as the pioneer, brand name drugs.

21.    Generic drugs are invariably priced below the branded drugs to which they are bioequivalent.  The first generic competitor to market typically does so at a price at least 30% lower than the price of the equivalent brand name drug and quickly takes a substantial amount of market share away from the brand name manufacturer.  As additional generic competitors come to market, the price of the generic equivalents continues to fall, and their combined market share continues to grow.

22.    The price competition engendered by generic drug manufacturers benefits all purchasers of the drug, who are able to buy the same chemical substance at much lower prices.

**C.    Abbreviated New Drug Applications for Generic Drugs**

23.    Congress enacted the Hatch-Waxman Act in 1984 to establish an abbreviated process to expedite and facilitate the development, approval and marketing of generic drugs.   To effectuate its purpose, the Hatch-Waxman Act permits a generic drug manufacturer to file an "abbreviated" new drug application ("ANDA"), which incorporates by reference the safety and effectiveness data developed and previously submitted to the FDA by the company that manufactured the original, "pioneer" drug.

24.    The most important new information that must be included in the ANDA concerns the generic company's position vis-a-vis the patent that the pioneer manufacturer claims applies to the drug.  Therefore, the ANDA filer must make one of four certifications to the FDA:

1. That no patent for the pioneer drug has been filed with the FDA (a "Paragraph I Certification");

2. That the patent (or patents) for the pioneer drug has (or have) expired (a "Paragraph II Certification");

3. That the patent for the pioneer drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III Certification"); or

4. That the patent for the pioneer drug is invalid or will not be infringed upon by the proposed generic company's product (a "Paragraph IV Certification").

21 U.S.C. §355(j)(2)(A)(vii). In the case of a patent that has not yet expired, the ANDA applicants only certification options are Paragraph III or IV certifications. *See id.* If the generic manufacturer makes a Paragraph IV Certification, the ANDA applicant must notify the patent owner of the filing and explain why the patent is invalid or will not be infringed. *See* 21 U.S.C. §355(j)(2)(A)(vi)(IV).

25. The patent owner, upon receiving a Paragraph IV Certification from an ANDA Applicant has a 45-day statutory period in which to initiate a patent infringement suit against the applicant. *See* 21 U.S.C. §355(j)(5)(B)(iii). If no action is initiated within 45 days, FDA approval of the generic product is not delayed by patent issues. However, if a patent infringement suit is brought within the 45-day window, FDA approval of the generic drug is automatically postponed until the earliest of: (i) the expiration of the patent: (ii) thirty months from the patent holders receipt of the Paragraph IV Certification (30-month stay); or (iii) a final judicial determination of invalidity or non-infringement from which no appeal can be or has been taken. *Id*; 21 C.F.R. §314.107.

### D.    Defendant's Wrongful Conduct

26.    Loperamide is a non-addictive opiate and is believed to treat diarrhea in a number of ways including regulating muscular contractions in the intestine, limiting secretions in the intestinal tract, and relieving abdominal discomfort.

27.    Simethicone is a drug employed to treat flatulence associated with diarrhea.

28.    The anti-diarrheal/anti-flatulent drug Immodium Advanced contains both loperamide and simethicone.  Immodium Advanced's predecessor drug, Imodium A-D, contains the anti-diarrheal loperamide but does not contain the anti-flatulent simethicone.

29.    When first marketed and sold in 1988, predecessor drug Imodium A-D was protected by a number of patents for loperamide (the "loperamide patents").  Upon expiration of the loperamide patents, Imodium A-D faced intense competition from generic manufacturers who could manufacture and sell a generic version of Imodium A-D for approximately 30% to 40% less than the price charged by Defendant.

30.    Upon expiration of the loperamide patents in the late 1980's, generic manufacturer Perrigo began marketing a generic brand of loperamide similar to that of Imodium A-D.

31.    In response to the generic competition it faced for Imodium A-D, Defendant directed one its scientists, Dr. Jeffrey Garwin, to develop a new patent-protected form of loperamide.  Pursuant to this directive, Dr. Garwin developed a drug which combined loperamide with the anti-flatulent simethicone.

32.    Dr. Garwin subsequently filed with the PTO for patents to cover the combination of loperamide and simethicone.  During the course of the prosecution of the patents, Defendant represented before the PTO that Dr. Garwin had discovered the concurrence of diarrhea and

9

flatulence and the invention to be awarded patent protection "lies not in the discovery of a novel solution to this problem, but in the discovery of the problem itself." Based upon Defendant's representations, the PTO issued two patents which were assigned to Defendant - U.S. Patent No. 5,248,505 (the "'505 patent") on September 28, 1993 and U.S. Patent No. 5,612,054 (the "'054 patent") on March 18, 1997.

33.     Subsequently, two additional patents were issued for the combination of loperamide and simethicone, U.S. Patent No. 5,679,376 (the "'376 patent") issued on October 21, 1997; and U.S. Patent No. 5,716,641 (the "641 patent") issued on February 10, 1998. Since their issuance, the '505, '054, '376 and '641 patents all have been held to have been issued erroneously and have been invalidated.

34.     Beginning on or about October 1, 1997, Defendant manufactured, marketed and sold the loperamide-simethicone drug combination under the brand name Imodium Advanced. Defendant's aggressively marketed Imodium Advanced as a significant advancement over Imodium A-D, spending approximately $45 million to win consumers over to its drug which had no generic competition. Imodium Advanced's sales skyrocketed in its first years on the market and are projected to reach $200 million by the end of 2002.

35.     Interest in a cheaper generic version of Imodium Advanced began almost immediately after Imodium Advanced went to market. Pursuant to this interest, Perrigo consulted outside patent counsel as to whether Perrigo's version of loperamide-simethicone would infringe the Imodium Advanced patents. Perrigo's patent counsel concluded the the proposed generic verison of loperamide-simethicone would not infringe the Imodium Advanced patents because these patents were invalid.

36.    On or about November 2000, Perrigo filed an ANDA seeking FDA approval to manufacture, mrket and sell a generic version of Imodium Advanced in the United States.

37.    Facing the threat of extinction of its extremely profitable Imodium Advanced product, Defendant filed suit against Perrigo, alleging patent infringement.  On April 22, 2002, this Court began to hear testimony in the trial of Defendant's patent infringement suit against Perrigo.  On or about June 25, 2002, this Court invalidated the '505 patent, the '054 patent, the '376 patent and the '641 patent as invalid for obviousness.

38.    In examining Defendant's representations made during the patent application to the PTO this Court found the following:

1.    With respect to Defendant's representation that Dr. Garwin had discovered the concurrence of diarrhea and flatulence, this Court found that Defendant failed to bring to the PTO's attention the existence of more than twenty scientific and medical articles and publications which noted the concurrence of diarrhea and gas-related symptoms that were issued before Dr. Garwin claimed to be the originator of the discovery.

2.    With respect to Defendant's representation to the PTO that Dr. Garwin was the first to combine an antidiarrheal with simethicone, the Court found that Defendant failed to bring to the PTO's attention that:

•    Since 1974 the FDA had approved of the use of simethicone in combination with other pharmaceuticals.

•    By the time of Dr. Garwin's claimed invention, simethicone was a well-known and increasingly popular antiflatulent, sold commercially in more than twenty-five products.

•    The dosage regimen in the proposed patents to be issued to Dr. Garwin were not

11

new Other marketed over-the-counter products contained the same amount of simethicone as proposed by Dr. Garwin.  Additionally, the amounts specified for loperamide by Dr. Garwin also were already used in several over-the-counter products.

•    At least as early as 1980, an Australian pharmaceutical reference publication included a reference to a product called Diareze which combined an antidiarrheal with simethicone.

•    A patent existing at the time of Dr. Garwin's proposal, the Chavkin patent, already covered the combination of an antidiarrheal with simethicone.

•    Another existing patent at the time, French Patent Publication 2,565,107, also covered the combination of an antidiarrheal with simethicone.

39.    Based on these compelling facts, this Court invalidated the patents for obviousness, stating that the Defendant had misled the PTO in that:

>    During the course of the lengthy prosecution of the...patents, [Defendant's] attorneys made a number of erroneous representations. ..First, McNeil incorrectly argued to the Patent and Trademark Office that Dr. Garwin had discovered the concurrence of diarrhea and flatulence...[however] Dr.Garwin did not discover the concurrence of diarrhea and gas.  Moreover...McNeil's attorneys failed to provide the Examiner with evidence that would have called into question McNeil's assertion that Dr. Garwin had discovered the concurrence of diarrhea and flatulence....Second, McNeil's attorneys permitted the Examiner to believe mistakenly that Dr. Garwin was the first to combine an antidiarrheal with simethicone.

40.    Defendant's conduct before the PTO was so egregious and exceptional that this Court ordered Defendant to pay Perrigo's attorneys' fees.  In awarding the attorneys' fees, this Court summarized Defendant's behavior during the prosecution of the patents as "careless, irresponsible, and, at the very least, tantamount to studied and deceptive ignorance."

**VI.**

12

G.    **The Effects of Defendants' Anti-Competitive Conduct
on the United States Market for Imodium Advanced**

41.    Defendants' improper patent filings are delaying and preventing the entry into the United States market of generic formulations of Imodium Advanced.

42.    The purpose of Defendants' anti-competitive conduct is to obtain and maintain monopoly power in the market for Imodium Advanced and its generic equivalents.

43.    Defendants have succeeded in obtaining this unlawful market power.  With this monopoly power, defendants have fixed prices for Imodium Advanced at artificially high and supra-competitive levels.

44.    Due to Defendants' monopolization, manufacturers of generic bioequivalents of Imodium Advanced are being restrained and denied the opportunity to market competing products, which would be marketed at substantially lower prices.

45.    Defendants have engaged in monopolistic practices concerning Imodium Advanced to avoid a loss in market share and revenues that would inevitably result following the introduction to the market of a competing generic product.

46.    As a result of Defendant's anti-competitive conduct, plaintiff and the Class have been and/or will be forced to pay supra-competitive and artificially high prices for Imodium Advanced.

**CLASS ACTION ALLEGATIONS**

47.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, specifically Rules 23(b)(2) and 23(b)(3), on behalf of the following class (the "Class"):

(a)    All persons residing in the United States of America, the District of Columbia, and Puerto Rico that have paid, in whole or in part, for Imodium Advanced between October 1, 2000 and the present (the "Class Period").

50.    With respect to Count II, the Class seeks damages as to those persons residing in the Indirect Purchaser States who have paid, in whole or in part, for Imodium Advanced during the Class Period (the "Indirect Purchaser State Claims").

51.    Excluded from the Class are Defendants and their respective subsidiaries and affiliates, all governmental entities, and all persons or entities that purchased Imodium Advanced for purposes of resale.

52.    Plaintiff believes, and therefor avers, that there are thousands of members in the above-described class; their exact number and identities being currently unknown to plaintiff but known to defendant and/or ascertainable from appropriate discovery.

53.    Among the questions of law and fact common to the Class are:

1.    Whether Defendants have unlawfully monopolized or attempted to monopolize the market for Imodium Advanced and its generic equivalents;

2.    Whether Defendants possessed and/or unlawfully extended their monopoly power over the market for Imodium Advanced and its generic equivalents;

3.    Whether Defendants, through their monopolization and/or attempted monopolization, have caused the prices of Imodium Advanced to be maintained at supra-competitive levels;

4.    Whether the Class suffered and continues to suffer antitrust injury; and

5.    Whether Defendants were and continue to be unjustly enriched to the detriment of the Class, entitling plaintiff and the Class to disgorgement of all monies resulting therefrom.

54.    Plaintiff's claims are typical of the Class because Plaintiff and all members of the Class were injured and continue to be injured in the same manner by Defendants' unlawful, anti-competitive and inequitable methods, acts and practices, and wrongful conduct in the conspiracies complained of herein, *i.e.*, they have paid supra-competitive and artificially high prices for Imodium Advanced and will continue to be forced to do so until the markets for Imodium Advanced and its generic equivalents are competitive and prices reach competitive levels.

55.    Plaintiff will fully and adequately protect the interests of all members of the Class. Plaintiff has retained counsel who are experienced in antitrust class action litigation. Plaintiff has no interests which are adverse to, or in conflict with, other members of the Class. The questions of law and fact common to the members of the Class predominate over any questions which may affect only individual members.

56.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable and prosecution as a class action will eliminate the possibility of duplicative litigation, while also providing redress for claims which would otherwise be too small to support the expense of individual, complex litigation. Defendants have acted or refused to act, as alleged herein, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

## COUNT I

### FOR DECLARATORY AND INJUNCTIVE RELIEF
### UNDER SECTION 16 OF THE CLAYTON ACT
### FOR VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT

57.    Plaintiff repeats and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

58.    Pursuant to U.S. patent laws, Defendant was given a lawful monopoly over sales of Imodium A-D drug products, but that monopoly was only lawful so long as the drug, or a method of its use, was fully covered by valid, unexpired patents.

59.    As described above, Defendant knowingly and willfully engaged in a course of conduct designed to extend their monopoly power.  This course of conduct included, *inter alia*, improperly filing a series of patents that merely replicated prior art in order to prevent Perrigo and other potential generic manufacturers, from selling a generic version of Imodium Advanced.

60.    During the Class Period, Defendant possessed monopoly power in the relevant market.

61.    Defendant intentionally and wrongfully maintained its monopoly power in the relevant market in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

62.    Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's antitrust violation alleged in this Count.  Their injury consists of paying higher prices for Imodium Advanced products than they would have paid in the absence of that violation.  Such injury is of the type antitrust laws were designed to prevent and flows from that which makes Defendant's conduct unlawful.

16

63.     Plaintiff and members of the Class are likely to purchase Imodium Advanced again in the future.

64.     Defendant intended to prevent generic manufacturers from entering the Imodium Advanced market by filing a series of patents replicating prior art and which are invalid for obviousness.  Now faced with judicial determination that these patents are invalid, Defendant, could continue to prevent any generic company from entering the market while an appeal is pending.  Injunctive relief is, therefore, appropriate under 15 U.S.C. §26.

65.     Plaintiff seeks to enjoin Defendant from engaging in future anti-competitive practices concerning the manufacture, distribution or sale of Imodium Advanced.  Plaintiff does not seek damages under Count I.

66.     Plaintiffs and the Class have no adequate remedy at law.

## COUNT II

### DAMAGE UNDER THE ANTITRUST AND DECEPTIVE PRACTICE STATUTES OF THE INDIRECT PURCHASER STATES

67.     Plaintiff repeats and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

68.     This Count is brought by plaintiff on behalf of the Class to assert the Indirect Purchaser State Claims.

69.     The attempts to monopolize and monopolization of the relevant market alleged herein violate the Indirect Purchaser States' antitrust and/or deceptive practice statutes as follows:

       1.     the aforementioned practices by defendants were and are in violation of Arizona Revised Statutes §44-1408B;

2.    the aforementioned practices by defendants were and are in violation of Cartwright Act, California Business and Professions Code Sections 16700, *et seq.* and/or the California Unfair Competition Act, California Business Professions Code Sections 17200, *et seq.*;

3.    the aforementioned practices by defendants were and are in violation of District of Columbia Code §28-4502, *et seq.* (1996 Repl.);

4.    the aforementioned practices by defendants were and are in violation of Chapter 501, Part II, Florida Statutes (the Florida Deceptive and Unfair Trade Practices Act;

5.    the aforementioned practices by defendants were and are in violation of Kansas Statutes Annotated §§50-801(b) and 50-101, *et seq.*;

6.    the aforementioned practices by defendants were and are in violation of Louisiana Revised Statutes §51:137, *et seq.*;

7.    the aforementioned practices by defendants were and are in violation of Maine Revised Statutes Annotated, 10 M.R.S.A. §1101, *et seq.*, and/or Maine's Unfair Trade Practices Act, 5 M.R.S.A. §205-A *et seq.*;

8.    the aforementioned practices by defendants were and are in violation of Massachusetts Ann. Laws, Ch. 93A, *et seq.*;

9.    the aforementioned practices by defendants were and are in violation of the Michigan Antitrust Reform Act, MCL §455-771, *et seq.* and/or the Michigan Consumer Protection Act, MCL §445.901 *et seq.*;

10.    the aforementioned practices by defendants were and are in violation of Minnesota Antitrust Act of 1961, Minn. Stat. §§325D.49-325D.66 (1998);

11.    the aforementioned practices by defendants were and are in violation of the Nevada Unfair Trade Practice Act, NRS 598A.010, *et seq.*;

12.    the aforementioned practices by defendants were and are in violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §57-1-1 to §57-1-5 (1998);

13.    the aforementioned practices by defendants were and are in violation of the New Jersey Consumer Fraud Act, N.J.S.A. §56:9-1, *et seq.*;

18

14.  the aforementioned practices by defendants were and are in violation of the New York General Business Law §340, *et seq.* and/or New York General Business Law §349;

15.  the aforementioned practices by defendants were and are in violation of North Carolina Gen. Stat. §75-1.1 *et seq.*;

16.  the aforementioned practices by defendants were and are in violation of North Dakota Cent. Code §51-08.1-08;

17.  the aforementioned practices by defendants were and are in violation of South Dakota antitrust law SDCL §37-1, *et seq.*;

18.  the aforementioned practices by defendants were and are in violation of Tenn. Code Ann. §47-25-101, *et seq.* and/or in violation of Tenn. Code Ann. §47-18.101, *et seq.*;

19.  the aforementioned practices by defendants were and are in violation of Vermont antitrust law Vermont Stat. §2453, *et seq.*;

20.  the aforementioned practices by defendants were and are in violation of West Virginia Consumer Credit and Protection Act, W. Va. Code §46-A-1-101, *et seq.*; and

21.  the aforementioned practices by defendants were and are in violation of the Wisconsin Antitrust Act §133.01 *et seq.*

68.    Plaintiff and the Class seek damages and multiple damages as permitted by law for their injuries by defendants' violations of the aforementioned statutes.

## COUNT III

### FOR RESTITUTION, DISGORGEMENT AND CONSTRUCTIVE TRUST FOR UNJUST ENRICHMENT BY DEFENDANTS

69.    Plaintiff repeats and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

70.    Defendant has benefitted from the monopoly profits on their sale of Imodium Advanced resulting from their unlawful and inequitable acts alleged in this Complaint.

19

71.    Defendant's financial benefits resulting from their unlawful and inequitable conduct are traceable to overpayments for Imodium Advanced by Plaintiff and members of the Class.  Plaintiff and the Class have conferred upon Defendants an economic benefit, in the nature of the profits resulting from unlawful overcharges and monopoly profits, to the economic detriment of Plaintiff and the Class.

72.    The economic benefit of overcharges and unlawful monopoly profits derived by Defendant through charging supra-competitive and artificially inflated prices for Imodium Advanced is a direct and proximate result of Defendant's unlawful practices.

73.    The financial benefits derived by Defendant rightfully belong to Plaintiff and the Class, as Plaintiff and the Class paid anti-competitive and monopolistic prices during the Class Period, inuring to the benefit of Defendant.

74.    It would be inequitable and unjust for Defendant to be permitted to retain any of the unlawful proceeds resulting from the filing of baseless patents.

75.    It would be inequitable for the Defendant to be permitted to retain any of the overcharges for Imodium Advanced derived from Defendants' unfair and unconscionable methods, acts and trade practices alleged in this Complaint.

76.    Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds received by them.

77.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendant traceable to Plaintiff and the Class.

78.    Plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court enter an Order:

1.      certifying the Class pursuant to the Federal Rules of Civil Procedure, certifying Plaintiff as the representative of the class, and designating its counsel as counsel for the class;

2.      declaring that Defendant's filing of patents that were objectively invalid for obviousness was in violation of §2 of the Sherman Act;

3.      declaring the Defendant's filing of patents that were objectively invalid for obviousness was in violation of the antitrust and/or deceptive practice statutes in the Indirect Purchaser States;

4.      enjoining and restraining Defendant's continuing violation of §2 of the Sherman Act, pursuant to §16 of the Clayton Act;

5.      granting Plaintiff and the Class equitable relief in the nature of disgorgement, restitution, and the creation of a construction trust remedy to Defendant's unjust enrichment;

6.      granting Plaintiff and the Class damages as permitted by law;

7.      granting Plaintiff and the Class their costs of prosecuting this action, together with interest and attorneys' fees, experts' fees and costs; and

8.      granting such other relief as this Court may deem just and proper.

DATED:  July _____, 2002

_____

Arnold Levin, Esquire
Laurence S. Berman, Esquire
Daniel Levin, Esquire
**LEVIN, FISHBEIN, SEDRAN & BERMAN**

21

510 Walnut Street
Suite 500
Philadelphia, PA 19106
(215) 592-1500
(215) 592-4663 (fax)


Linda P. Nussbaum
Jacqueline E. Bryks
**COHEN MILSTEIN HAUSFELD & TOLL**
825 Third Avenue, 30th floor
New York, NY 10022-7519
Tel:  (212) 838-7797
Fax:  (212) 838-7745

***Attorneys for Plaintiff***